IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| JAMES EMERY | : |
| | : |
| v. | : Civil No. WMN-04-2726 |
| | : |
| BAY CAPITAL CORPORATION | : |

### MEMORANDUM

Before the Court are the motion for partial summary judgment filed by Plaintiff James Emery, Paper No. 38, and cross motion for summary judgment filed by Defendant Bay Capital Corp., Paper No. 49.[1]  Each motion is fully briefed[2] and ripe for decision. Upon a review of the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that Plaintiff's motion will be granted and Defendant's will be denied.

### I.  FACTUAL AND PROCEDURAL BACKGROUND

This is a contract dispute in which Defendant seeks to avoid liability to Plaintiff for $36,000 of severance pay and $719.50 of travel reimbursement.  Defendant is a mortgage lending company located in Maryland.  Plaintiff lives in Tennessee.  The

---

[1]  Also before the Court is Defendant's alternative motion to postpone ruling until the close of discovery, filed in conjunction with its opposition.  It will be denied as moot.

[2]  The cross motions are actually over-briefed. Disregarding Local Rule 105.2.c, each party filed three memoranda pursuant to the cross motions, instead of only two as the rule requires.

relevant facts follow chronologically.

In October 2002, Defendant entered negotiations with Plaintiff to hire him as its Vice-President, Director of Net Branching.  On October 28, 2002, after an interview in Baltimore, Maryland, Defendant's President, Stewart Sachs, sent Plaintiff an e-mail (the Offer E-mail), which stated in relevant part:

> Jim, we propose the following:
>
> - Base salary $72,000
> . . . .
> - reimbursement for business travel and expenses
> . . . .
> - Title - VP, Director of Net Branching
> - Severance - after a period of six months (honeymoon) six months salary if terminated for any reason other than fraud or misrepresentation
> . . . .
> Please accept this as our written offer of employment.

Pl.'s Mot. Exh. 1.  Soon after receiving the Offer E-mail, in the first week of November 2002, Plaintiff began working for Defendant as its Vice-President, Director of Net Branching.  The parties never jointly signed a formal employment agreement but Plaintiff was compensated in a manner consistent with the Offer E-mail's terms and with a $72,000 salary.

Throughout his employment with Defendant, Plaintiff owned a home in Tennessee where he performed some of his work for Defendant.  Plaintiff also regularly traveled to Maryland, staying at least several days per month, where he performed the remainder of his work responsibilities.  In the Spring of 2003, Plaintiff utilized Defendant to re-finance the mortgage on his

2

Tennessee home and, in response to questioning by Defendant's President, stated that he was not planning to move to Maryland.

In June 2003, Defendant drafted an employment agreement for Plaintiff and presented it to him.  Plaintiff did not sign it or even state that he agreed with its terms.

More than three months later, on October 2, 2003, Defendant terminated Plaintiff.  In so doing, Defendant's Executive Vice-President sent Plaintiff a letter stating:

> Jim: As per our conversation today Bay Capital Corp. has decided to eliminate your position as Vice President, Branch Operations effective immediately. This decision was unfortunate but necessary.
> Bay Capital appreciates your service during the 11 months and would be happy to provide a reference if asked.
> You will be compensated as agreed through September production and base salary through October, provided your cooperation in sending the original branch files to corporate and any and all Bay Capital Corp. materials.
> If I can be of help to you in the future, please call me anytime.
> Sincerely,
> [signed]
> Ben Lyons
> Executive Vice President
> Bay Capital Corp.

Plaintiff subsequently requested, pursuant to the E-mail Offer, six months severance pay and reimbursement for work-related and non-refundable airline tickets that he purchased before he was terminated.  Defendant denied both requests.

Substantial litigation ensued.  Plaintiff filed suit in Tennessee state court, and Defendant removed the case to the

United States District Court for the Western District of Tennessee.  Defendant then successfully moved for transfer to this Court pursuant to 28 U.S.C. § 1404(a).  On January 25, 2005, this Court denied Defendant's partial motion to dismiss, finding that Plaintiff's claims were not preempted by ERISA.  On April 7, 2005, this Court also denied Defendant's expedited motion to vacate a portion of an order issued in the Western District of Tennessee, which had required Defendant to pay Plaintiff's travel expenses if he were deposed in Maryland, instead of Tennessee.[3]

Plaintiff filed for summary judgment on March 29, 2005.  In opposition, Defendant also requested a postponement on ruling on Plaintiff's motion until the close of discovery so that Defendant could discover whether it had an agreement with Plaintiff and whether its performance under the contract was excused by Plaintiff's possible breaches.  Defendant then filed its own summary judgment motion on July 8, 2005, where it first introduced its assertion that Plaintiff was fired for misrepresenting that he was going to move to Maryland.

## II. LEGAL STANDARD

A moving party is entitled to summary judgment only upon showing that there exists no genuine issue as to any material

---

[3] In so doing, this Court noted that Defendant's initiation of "costly and time-consuming legal filings" over Plaintiff's deposition travel expenses was "[p]articularly unseemly" given Defendant's characterization of the relevant airfare costs as merely "nominal."  See April 7, 2005, Mem. at 5 n.3.

fact, and it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Blue Ridge Ins. Co. v. Puig, 64 F. Supp. 2d 514 (D. Md. 1999) (citing, inter alia, Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

"Where . . . both parties have moved for summary judgment, it does not establish that there is no issue of fact and require that summary judgment be granted to one side or another." World-Wide Rights Ltd. P'ship v. Combe, Inc., 955 F.2d 242, 244 (4th Cir. 1992) (citation and internal quotation marks omitted).  When both parties file motions for summary judgment, the court applies the same standards of review.  Taft Broadcasting Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991); ITCO Corp. v. Michelin Tire Corp., 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment--even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard."  Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co., 627 F. Supp. 170, 172 (D. Md. 1985) (quoting Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2720).

### III.  DISCUSSION

Defendant argues the following: (1) the Offer E-mail was too

vague to constitute any part of a binding contract; (2) even if its terms are binding, Plaintiff's misrepresentation about his intentions to relocate excuses Defendant's obligation to make any further payment; and (3) even if it is obligated to pay, the Maryland Wage Payment and Collection Law (MWPCL), MD. CODE ANN. LAB. & EMPL. §§ 3-501-3-509 (West Supp. 2004), does not cover severance pay and cannot apply to non-residents.  Defendant is wrong on every point.

### A.  The Offer E-mail as valid contract

"It is well settled that Maryland follows the objective law of contracts [such that a] court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated."  General Motors Acceptance Corp. v. Daniels, 492 A.2d 1306, 1310 (Md. 1985) (citations omitted).  The Court of Appeals adds that "when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed." Id.  It concludes, "the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean." Id.

Defendant first seeks to avoid its obligation to tender the severance pay and reimbursement it plainly and unambiguously offered Plaintiff by arguing that the Offer E-mail is entirely

6

invalid because it lacks terms essential to contract formation. Specifically, Defendant claims that the Offer E-mail is too vague to be a contract because it lacks a durational term and does not delineate Plaintiff's duties as "VP, Director of Net Branching." Defendant also adds that the Offer E-mail should be disregarded because it was not the parties' "final agreement."

Defendant essentially invites the Court to misapply the contract law principle that holds "no action will lie upon a contract, whether written or verbal, where such a contract is vague or uncertain in its essential terms."  See Robinson v. Gardiner, 76 A.2d 354, 356 (Md. 1950).  The Robinson court explains that parties to a contract "must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean.  If the agreement be so vague and indefinite that it is not possible to collect from it the intention of the parties, it is void because neither the court nor jury could make a contract for the parties."  Id.

While these principles of law remain quite sound today, no such uncertainty clouds the Offer E-mail, whose core terms are the exchange of payment at a rate of $72,000 per year for Plaintiff's services as Defendant's vice president, director of net branching.  The fact that the parties performed successfully under the contract for almost a year vitiates Defendant's argument that the agreement is too vague or uncertain to be legally enforceable.  The Court has no trouble discerning the essential terms of the Offer E-mail.  Furthermore, it is now only

asked to enforce two unambiguous clauses, which call for six months of severance pay and reimbursement for business travel expenses.[4]  Uncertainty provides no basis for declining to enforce this agreement.

Nor does the absence of a durational term render the Offer E-mail too vague to be enforceable as an employment contract. Its indefinite duration simply makes it an at-will employment contract.  See Suburban Hosp., Inc. v. Dwiggins, 596 A.2d 1069, 1073 (Md. 1991) ("In Maryland, at-will employment is an employment contract of indefinite duration.").  As such, either party was at liberty to end the relationship whenever either desired, just as Defendant ultimately did in October 2003.

At the same time, however, while the Suburban court stresses the relative ease with which employers and employees can ordinarily terminate at-will employment contracts, it unequivocally states that certain employer statements "become contractual obligations when, with knowledge of their existence, employees start or continue to work for the employer."  Id. at

---

[4]  By way of contrasting example, the Robinson court was asked to enforce an insurer's alleged agreement to provide "insurance in an amount in excess of $20,000 liability for personal injury . . . which would keep plaintiffs free from any and all liability for either personal injury or property damage [related to plaintiffs' use of a commercial truck.]"  Id.  The court noted it was an "impossible undertaking" to ascertain the amount of coverage promised under this alleged agreement and affirmed the lower court's refusal to entertain a suit seeking coverage under the alleged agreement, beyond that which was provided under the actual written agreement in place at the time of the accident.  Id. at 357

1075 (quoting <u>Dahl v. Brunswick Corp.</u>, 356 A.2d 221, 224 (Md. 1976) (internal citations omitted)).[5]  Even more to the point, the same court stated that "[i]f an employer unilaterally adds specific limitations or conditions on the right to terminate at-will, those specific limitations or conditions should be enforced by the courts . . . ."  <u>Id.</u> at 1077.  Here, Defendant unilaterally put forth the conditions of severance pay and travel reimbursement in its Offer E-mail.  The Court has no basis to excuse Defendant's failure to comply with its self-imposed conditions.

The parties' subsequent conduct further affirms that the Offer E-mail constituted a legally enforceable employment contract.  It is an elementary principle of law that mutual assent to form a contract exists where each party "knows or has reason to know that the other party may infer from his conduct that he assents."  RESTATEMENT (SECOND) OF CONTRACTS § 19.  Defendant sent the Offer E-mail with the explicit and unambiguous request, "[p]lease accept this as our written offer of employment" and

---

[5]  In <u>Dahl</u>, the Maryland Court of Appeals held that the defendant employer, who sold plaintiffs' division to a company that immediately hired them under virtually identical terms of employment, was still obligated to furnish severance pay to those at-will employees consistent with the defendant's written policy statements.  <u>Dahl v. Brunswick Corp.</u>, 356 A.2d 221, 224 (Md. 1976).  It so held despite the fact that some of the 21 plaintiffs had not even read the statements but were merely aware of the severance benefits described in them.  <u>Id.</u> at 223.  The distinction between these <u>Dahl</u> plaintiffs, whose knowledge of the company-wide severance benefits was merely second-hand, and Plaintiff, whose promised severance pay was directly communicated to him in a personal e-mail sent by Defendant's President, only reinforces the propriety of holding Defendant to its bargain.

Plaintiff responded by timely reporting to work for Defendant. From there, Defendant accepted Plaintiff's work without requiring any additional written agreement and the parties each performed for 11 months in a manner consistent with the Offer E-mail's terms.

Defendant has no reasonable basis to believe that the terms of the Offer E-mail were anything less than the parties' "final agreement," which legally controls the employment relationship.[6] Not only does the parties' conduct correspond with the terms of the Offer E-mail, but with discovery now complete, Defendant still cannot produce any other written agreement that would indicate the Offer E-mail's terms are not in fact the final and controlling agreement.[7]  The Court, therefore, finds as a matter

---

[6] Defendant's citations to case law supporting the proposition that negotiations preceding a formal contract are non-binding are simply inapposite because the deals contemplated by those parties were never consummated.  See, e.g., Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd. P'ship, 734 F. Supp. 1181, 1189 (D. Md. 1990) (stating "parties never throughout the course of their negotiations reached an agreement" to construct office building as joint venturers); Abt Assoc.s, Inc. v. JHPIEGO Corp., 104 F. Supp. 2d 523, 529 (D. Md. 2000) (stating that contractor notified potential subcontractor it "would not be entering into any type of business or contractual relationship" after extensive negotiations failed to produce agreement).  Here, in stark contrast, negotiations to hire Plaintiff never broke down at all; he performed under the disputed agreement for almost a year.

[7] Defendant considers two writings to be highly probative of the Offer E-mail's alleged invalidity.  First, in June 2003, more than six months after Plaintiff began working, Defendant sent Plaintiff a proposed two-page employment agreement, which Plaintiff never signed.  Second, during the course of those failed negotiations, Plaintiff sent Defendant an e-mail that included the phrase "any word on my agreement."  The Court wholly

of law that the Offer E-mail is a valid and enforceable at-will employment agreement between the parties.

B.  <u>Termination not based on alleged misrepresentation</u>

Defendant argues next that, notwithstanding the validity of the Offer E-mail, Plaintiff is not entitled to severance pay or travel reimbursement because Defendant terminated him for misrepresenting his intention to move to Maryland.  Several facts, however, coalesce to render that assertion simply unreasonable.  First, Defendant admits that in the Spring of 2003, it was fully aware that Plaintiff was not going to move to Maryland.  Second, Defendant's termination letter gives absolutely no indication that Plaintiff's reluctance to move had anything to do with his termination.  Third, as late as April 2005, with litigation well under way and in opposition to Plaintiff's summary judgment motion, Defendant still failed to state that Plaintiff's residency was a factor in Defendant's decision to terminate him.  The Court addresses each fact in turn.

In its motion for summary judgment, Defendant asserts that it fired Plaintiff because of his failure to relocate to Maryland and now insists that such relocation was an essential term of

---

rejects Defendant's assertion that either Defendant's unsuccessful attempts at novation (or modification) or Plaintiff's mere recognition that Defendant desired contractual changes indicate that no prior contract existed or that such negotiations can reasonably be considered to have voided the prior agreement.

11

Plaintiff's employment and one upon which Defendant relied when hiring him.  Yet, Defendant states that as early as Spring 2003 "it became apparent [that Plaintiff] had misrepresented his intentions regarding moving to Maryland."  Def.'s Mot. at 14.  Such a revelation would logically prompt an employer to do one of two things: (1) terminate the employee soon thereafter because of the material misrepresentation; or (2) accept that he would not be moving and continue with the relationship.  In deciding to "stop[] pressing" Plaintiff on the issue of relocation to Maryland and continue employing him until October 2003, Defendant appears to have chosen the latter.  See id.

Far more fatal to Defendant's argument, however, is its conduct when terminating Plaintiff.  When Defendant terminated Plaintiff in October 2003, it did so in a manner utterly at odds with behavior one could reasonably expect if the termination was actually caused by an employee's material misrepresentation.  As stated more fully above, Defendant's termination letter stated that it had made the "unfortunate but necessary" decision to "eliminate [Plaintiff's] position as Vice President, Branch Operations effective immediately."  It added its appreciation for his service and expressed ready willingness to provide a reference if asked.

While the Court recognizes the value in termination letters that are crafted in a manner that is professional, civil, and

forward-looking, the complete absence of any reference to a material representation by Plaintiff makes it difficult to believe that any misrepresentation actually played a significant role in the termination. Not only is Defendant's purported reason not mentioned in the letter, but Defendant presents an entirely different and fully viable justification, elimination of Plaintiff's position, as its reason. In light of these facts, it is difficult to comprehend a reasoned basis for asking the Court to conduct a trial to decide if the termination was for Plaintiff's misrepresentation of his plans to move to Maryland.

Finally, Defendant's April 2005 opposition to Plaintiff's summary judgment motion pushes the assertion beyond the realm of the unreasonable. In it, Defendant asks the Court to postpone ruling on Plaintiff's summary judgment motion so that Defendant may conduct discovery to establish Plaintiff's fraud and misrepresentation and determine whether Plaintiff intended to comply with Defendant's conditions for hiring him. Def.'s Opp. at 3. These are completely immaterial to the question at hand.

Once Plaintiff completed six months of work, Defendant was obligated pursuant to the Offer E-mail to tender six months severance pay "if [Plaintiff was] terminated for any reason other than fraud or misrepresentation." By the terms of the agreement, the critical inquiry is <u>Defendant's reason</u> for terminating Plaintiff, which was necessarily known to Defendant at the time

13

of the termination.  It is entirely irrelevant whether Defendant can subsequently discover if Plaintiff had in fact engaged in any fraud or misrepresentation related to his employment.  An undiscovered <u>post hoc</u> justification for the termination cannot be the reason for the termination.  Defendant's assertion that it "cannot adequately oppose the Plaintiff's motion" without discovery speaks volumes as to the merits of its legal position.  <u>Id.</u>

The Court finds as a matter of law that the termination was not based on Plaintiff's fraud or misrepresentation.  No reasonable juror could conclude otherwise.  Plaintiff is entitled to six months severance pay, amounting to $36,000, and $719.50 in travel reimbursement.

### C.  <u>Applicability of MWPCL to non-residents</u>

Notwithstanding the contract's binding effect, the parties dispute whether Plaintiff can properly maintain his action for severance pay under the MWPCL because he is a resident of Tennessee and performed most of his work for Defendant while in Tennessee.

The MWPCL requires employers to "pay an employee . . . all wages due for work that the employee performed before the termination of the employment . . . ."  MD. CODE ANN. LAB. & EMPL. § 3-505 (West Supp. 2004).  Wages include bonuses, commissions, fringe benefits, and "any other remuneration promised for

service." Id. § 3-501(c).  The statute not only authorizes a private cause of action but also allows the court to award an employee up to three times his wage as well as attorney's fees where the employer withheld wages in the absence of a "bona fide dispute."  Id. § 3-507.1.

The statute does not specifically address whether severance pay is a "wage" but Maryland case law directs that the critical inquiry examines when a plaintiff earned his severance pay relative to his termination.  Interpreting the MWCPL, the Court of Appeals has carefully explained that when pursuing recovery for breach of an employment contract "there is a difference between future wages and past wages."  Battaglia v. Clinical Perfusionists, Inc., 658 A.2d 680, 685 (Md. 1995).  Because of the "express limitation in § 3-505 to wages 'due for work that the employee performed before the termination of employment' . . . . there is no violation giving rise to an action under § 3-507.1 where wages have been paid in full for work that was performed prior to termination."  Id. at 686.

Decisions following Battaglia have reinforced the principle that under the MWPCL, once payment "has been promised as a part of the compensation for service, the employee [is] entitled to its enforcement as wages."  Whiting-Turner Contracting Co. v. Fitzpatrick, 783 A.2d 667, 672-673 (Md. 2001) (finding MWPCL does not apply to bonus that is merely gratuitous); see also Medex v. McCabe, 811 A.2d 297, 305 (Md. 2002) (finding employee's

15

incentive fees vested despite not meeting contract's continued employment provision because public policy behind MWPCL is that "an employee's right to compensation vests when the employee does everything required to earn the wages"). The Maryland Court of Special Appeals recently addressed the extent to which the MWPCL applies to claims for severance pay. Stevenson v. Branch Banking & Trust Corp., 861 A.2d 735 (Md. App. 2004) (finding severance pay promised for honoring covenant not to compete after termination was not covered by the MWPCL). After reviewing the statutory language as well as the holdings and reasoning of both Whiting-Turner and Medex, the Stevenson court stated:

> Given the broad language of the statute and its remedial purpose, we conclude that the scope of Maryland's Wage Payment Act extends to the type of severance pay that represents deferred compensation for work performed during the employment. Thus, a severance benefit that is based on the length and/or nature of the employee's service, and promised upon termination, may be recoverable under the Wage Payment Act.

Id. at 749.

Here, Plaintiff was promised six months worth of severance pay once he reached the six month milestone with Defendant, provided that his termination was not due to fraud or misrepresentation. Because the Court has already shown that his termination was not based on such misconduct and there is no dispute that Plaintiff worked more than six months for Defendant, Plaintiff had already done everything required under the agreement to earn his severance pay at the point of termination. His claim for the severance pay therefore fits within the MWPCL's

16

as a statutory definition of a "wage."

As Defendant's last effort to avoid honoring its agreement, it argues that Plaintiff has no standing under the MWPCL because he is a resident of Tennessee and performed the majority of the work for Defendant while in Tennessee.  Defendant argues that the statute was intended only to cover employees who reside in Maryland.  The statute itself, however, simply does not address a residency requirement for covered employees; it merely states that an "[e]mployer" under the MWPCL is "any person who employs an individual in the State . . . ."  MD. CODE ANN. LAB. & EMPL. § 3-501 (West Supp. 2004).  The statute does not define "employee."

Beyond the slim statutory guidance, no Maryland court has had the occasion to rule on the validity of a non-resident's MWPCL claim.  The Court of Appeals, however, after carefully reviewing the legislative history of the MWPCL, has repeatedly stated that the "principal purpose of the [MWPCL] 'was to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages.'"  Medex, 811 A.2d at 304 (quoting Battaglia, 658 A.2d at 686).

Defendant downplays the notion that the MWPCL exists to encourage Maryland employers to pay their employees; instead, it directs the Court's attention to decisions from other jurisdictions construing similar state wage payment statutes and finding generally that non-residents without a substantial connection to the forum lack standing to bring these statutory claims.  See Glass v. Kemper Corp., 920 F. Supp. 928, 931 (N.D.

17

Ill. 1996) (holding that Illinois Wage Act, 820 ILL. COMP. STAT. 115/1, which "applies to all employers and employees in this State" did not cover non-resident employee who performed all of his work in Spain for his Illinois employer); Killian v. McCulloch, 873 F. Supp. 938, 942 (E.D. Pa. 1995) (finding non-resident employees based in California, New York and New Jersey were not covered by state wage law, similar in structure to MWPCL, and holding that "protections contained in [Pennsylvania's wage act, 43 PA. STAT. ANN. §§ 260.1-260.12 (1992)] extend only to those employees based in Pennsylvania") aff'd by Stadler v. McCulloch, 82 F.3d 406 (3d Cir. 1996) (unpublished table decision); Vengurlekar v. Silverline Technologies, Ltd., 220 F.R.D. 222, 231 (S.D.N.Y. 2003) (noting correctly that "Killian has since been re-affirmed, distinguished and rejected" but nonetheless following Killian and finding that New Jersey wage law does not protect North Carolina employees where only connection to New Jersey is employer's headquarters).

The Court believes that, while close adherence to the Killian decision would likely direct a finding that Plaintiff is not protected by the MWPCL, Killian is not persuasive. First, the short factual summary in Killian provides no insight into the extent of the plaintiffs' connection to the forum state, saying little more than "the plaintiffs were never based in Pennsylvania and are not residents of the Commonwealth." Killian, 873 F. Supp. at 941. Because Killian does not address the connection that those plaintiffs (based in California, New York, and New

18

Jersey) had with Pennsylvania, this Court, if it attempted to follow Killian, would have difficulty deciding whether Plaintiff, who clearly spent substantial amounts of time in Maryland pursuant to his employment duties, was "based" in Maryland for the purposes of his employment with Defendant.  Killian also does not appear to have been particularly persuasive to other courts.  See Vengurlekar, 220 F.R.D. at 231 (noting correctly that Killian has not been uniformly followed, even by courts applying the same Pennsylvania wage law).

Furthermore, Defendant's remaining cases, limiting the scope of state wage laws, are readily distinguishable.  The plaintiffs in Glass and Vengurlekar clearly had no personal connection to the states where they sought statutory protection.  Given the substantial amount of work that Plaintiff performed in Maryland, the Court is reluctant to use these cases as a basis to conclude that Maryland has no interest Plaintiff's in MWPCL claim.

This Court is particularly persuaded by the construction of the statute made by Maryland's highest court.  Again, the Court of Appeals, while not addressing residency, has emphasized that the MWPCL's legislative history shows that the "principal purpose of the [MWPCL] 'was to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages.'" Medex, 811 A.2d at 304 (quoting Battaglia, 658 A.2d at 686).  For this reason, the Court rejects Defendant's argument that Maryland has virtually no interest in requiring its employers to pay their workers.  The Court also declines Defendant's invitation to adopt

19

a rule that non-resident employees of Maryland employers cannot pursue claims under the MWPCL until they cross the nebulous threshold of being 'based' in Maryland.  This Court, therefore, concludes that Plaintiff, an employee who performed a substantial portion of his work duties while here in Maryland, is not barred from bringing his MWPCL claim against Defendant, a Maryland employer.

## IV. CONCLUSION

For the reasons set out herein, Plaintiff's motion for partial summary judgment[8] will be granted and Defendant's motion for summary judgment will be denied.  A separate order consistent with the reasoning of this Memorandum will follow.

```
                      /s/
         William M. Nickerson
         Senior United States District Judge
```

Dated: August 30, 2005

---

[8]  While this decision concludes Plaintiff's breach of contract action, the case will not be closed because the MWPCL allows Plaintiff to recover up to three times the award, as well as attorney's fees and costs, if the factfinder subsequently determines there was no bona fide dispute over the withheld wages.  MD. CODE ANN. LAB. & EMPL. § 3-507.1 (West Supp. 2004).